Filed 2/28/25  P. v. Ortega CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DANIEL ORTEGA,<br><br>　　　Defendant and Appellant. | A164581<br><br>(Contra Costa County<br>Super. Ct. No. 05001706514) |

　　　Defendant Daniel Ortega appeals a final judgment following his joint trial for murder, assault, and robbery with codefendants Daniel Porter-Kelly and Ray Simons.  Ortega and Porter-Kelly were convicted of assault and second degree murder under an aiding and abetting implied murder theory.  Simons was convicted of first degree murder, robbery, assault, and possession of a firearm by a felon.  The jury also found true the special allegation that Simons personally and intentionally discharged a firearm, causing great bodily injury and death.

　　　On appeal, Ortega argues that his second degree murder conviction should be reversed for insufficient evidence.[1]  After he filed his opening brief, we issued our opinion in *People v. Porter-Kelly* (Dec. 4, 2024, A165660)

---

[1] Ortega does not challenge his assault conviction.

1

[nonpub. opn.], which reversed Porter-Kelly's second degree murder conviction based on our high court's holding in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*). The People concede that in light of our opinion and *Reyes*, reversal of Ortega's second degree murder conviction is warranted because his "participation and involvement in the beating and shooting [of the victim] is virtually the same as Porter-Kelly's." We agree and accordingly reverse.*

## I. **BACKGROUND**

### A. Procedural History

In April 2017, a grand jury indicted Ortega, Porter-Kelly, and Simons for murder (Pen. Code,[2] § 187, subd. (a)), second degree robbery (§ 211), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). The indictment also charged Simons with one count of unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)), and alleged against Simons a robbery-murder special circumstance (§ 190.2, subd. (a)(17)) as well as an enhancement for personal use of a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (e)).

Following trial, the jury found Simons guilty of all counts and found true the robbery-murder special circumstance as well as the personal use of a firearm enhancement. The jury found Ortega and Porter-Kelly guilty of second degree murder and assault with force likely to inflict great bodily injury but acquitted them of robbery and the lesser included offense of petty theft.

Following the verdict, the trial court heard and denied Ortega's motion for a new trial. The court sentenced Ortega to 15 years to life in prison for

---

*

[2] All further statutory references are to the Penal Code.

the second degree murder conviction and imposed a three-year midterm for the assault conviction, stayed pursuant to section 654. Ortega timely appealed.

B. Facts[3]

1. *The Night of the Shooting*

On November 11, 2016, Ortega met a woman named D. Herrera at a mutual friend's house in Antioch around 11:00 p.m. They drank at the house for a bit and then drove to the Capri Club in Ortega's car around 12:30 a.m. Once they got there, Ortega introduced Herrera to Simons and Porter-Kelly. Herrera had one or two drinks at the bar while Ortega drank and played pool with his friends. Half an hour later, William Sims, a young African-American man, walked into the bar. Some of the patrons gave him dirty looks.

Sims interacted with two women who were hanging out with Porter-Kelly and Simons. Porter-Kelly appeared unhappy with this and said, "Fuck that N-word." Sims responded, "Fuck who?", and Porter-Kelly replied, "Oh, he's pimping?" and "We'll see how Urkel's pimping." At another point that night, Simons was talking with Ortega and said, " 'Hey, you know what, I just bought a little ass pistol' " and " 'I'm gonna put 12 in this motherfucker.' " Around closing time, Herrera was outside by the back door of the bar smoking a cigarette with Sims. Ortega, Porter-Kelly, and Simons were also there. Sims tried to shake hands with Ortega, but he refused. Simons then came over and asked Sims if he wanted to buy some cocaine. Sims said that he only had a dollar, and Simons replied, "Come over here, and we'll see what we can do."

---

[3] Our summary of the background facts is abbreviated given the People's concession that reversal is appropriate.

Sims, Simons, Ortega, and Porter-Kelly walked off to another area in the back, next to some chairs.  Herrera stayed by the back door but overheard Sims say he was from Compton, "where people get merked," and "[t]hat's why I keep a gun on me."  Sims appeared to be joking.  Herrera then saw Ortega punch Sims in the face and knock him to the ground.  Porter-Kelly, Simons, and Ortega then all started punching and kicking Sims.  Herrera testified that she screamed for help and threw herself over Sims to prevent him from getting hit.  Ortega yanked her off Sims and told her not to interfere.

Herrera recalled that she wanted to escape and get help so she ran to Ortega's car, found the keys in the center console, and began backing the car out of the driveway.  Moments later, Ortega ran to the car, got into the front passenger seat, and said, "Bitch, drive."  Simons then came up to the driver's side of the car with a wallet in his hand and said, "I found his wallet.  He has nothing in it but a dollar and some swipers [credit cards]."  Ortega told Simons to get rid of the wallet.  Herrera did not see what Simons did with the wallet.  Simons then jumped into the rear passenger seat and told Herrera to go.  After Herrera backed out of the driveway, Sims ran up, put his hands on the hood of the car, and banged on it.  He was bloodied and injured.  Simons rolled down his window and fired two shots at Sims.  After that, Ortega and Simons told Herrera to drive.  As they drove off, Herrera looked in the rearview mirror and saw Sims lying on the ground.

### 2. *Police Investigation*

Shortly after the shooting around 2:10 a.m., Sergeant Justin Varady, who was on patrol, saw Sims lying on the street near the driveway of the Capri Club.  He had a large amount of blood on his head and face.  Paramedics arrived and pronounced Sims dead.  A single shell casing was found approximately three feet away from Sims.  The police could not locate

Sims's wallet or any identifying information on him. Sims's pants pockets were found emptied and pulled out. In the back area of the Capri Club, the police found blood drops, knocked over chairs, a beer bottle, Sims's bank card, and two cell phones. One of the phones was Sims's and the other was Ortega's, though Ortega's phone "had been wiped clean remotely."

When the police initially interviewed Herrera, she said that she met someone named "Val" on an online dating website and agreed to meet him at the Capri Club on the night of the shooting. She later admitted that she actually met Ortega at her friend's daughter's house and had lied that his name was "Val." She also initially told the police that Porter-Kelly was in the getaway car with Simons and Ortega and was the driver. Video surveillance, however, showed that Porter-Kelly left in a separate car through a different driveway of the Capri Club.

### 3. *Trial Testimony*

The prosecution called Herrera as its main percipient witness. Herrera explained that she initially lied to the police because she was scared of Ortega and Simons. According to Herrera, as they were driving away after the shooting, Ortega commented that Herrera was "going to snitch." Simons responded, "she's not going to tell because she knows what's going to happen to her if she does tell. We know where your family lives."

The prosecution's forensic pathologist expert testified that Sims's cause of death was a gunshot wound to the head. Additionally, Sims had approximately 15 blunt impact head injuries that included various lacerations and abrasions. Some of these injuries were consistent with being struck by the edge of a gun. The expert opined that although these blunt impact injuries were significant and could have possibly resulted in death, "they looked survivable."

5

Ortega called his own forensic pathologist expert, who opined that the only cause of Sims's death was the gunshot wound and that the other blunt force head injuries he suffered were not severe enough to have caused his death. Ortega also called two long-time friends as witnesses. They both testified that Ortega was not racist and had no animosity towards African-Americans.

## II. DISCUSSION

### A. Standard of Review

When a defendant challenges his or her conviction based on insufficiency of the evidence, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### B. Second Degree Murder Conviction

Ortega argues that his second degree murder conviction, which was premised exclusively on a theory of aiding and abetting implied malice murder, must be reversed in light of our high court's holding in *Reyes, supra,* 14 Cal.4th 481. The People concede that reversal is warranted as there is no evidence that Ortega *knew* Simons intended to shoot Sims or *intended to aid* Simons in the shooting, which was the act that proximately caused Sims's death. We agree and reverse.

Recent amendments by the Legislature eliminated liability for murder under the natural and probable consequences doctrine. (Stats. 2018, ch. 1015, § 1, subd. (f).) Aiding and abetting implied malice murder, however, remains a valid theory of liability. (*People v. Clements* (2022)

6

75 Cal.App.5th 276, 301.) Liability under this theory exists if a defendant knows that his or her conduct is dangerous to human life and acts with conscious disregard for life. (*People v. Powell* (2021) 63 Cal.App.5th 689, 713 (*Powell*).)

In *Reyes, supra,* 14 Cal.5th 981, our Supreme Court discussed the elements of aiding and abetting implied malice murder that were established in *Powell, supra,* 63 Cal.App.5th 689. " 'In the context of implied malice, the actus reus . . . includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes,* at p. 991, quoting *Powell,* at p. 713.)[4]

As the People concede, the relevant inquiry is whether Ortega knew that Simons intended to shoot Sims following the assault and intended to aid him in the shooting. There is no evidence of that here. The fact that Ortega may have known that Simons had a loaded firearm on the night of the shooting is insufficient to establish that he knew Simons intended to shoot Sims or intended to aid Simons in the shooting. (See *Reyes, supra,* 14 Cal.5th at pp. 991–992.) To the contrary, the evidence shows that Ortega

---

[4] The relevant *act* "is the act that proximately causes death." (*Powell, supra,* 63 Cal.App.5th at p. 713, fn. 27.) "[A]cts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement." (*Reyes, supra,* 14 Cal.5th at p. 989.)

7

and Simons were attempting to flee the scene after the assault ended and that Simons himself only formed the intent to shoot *after* Sims ran up and banged on the hood of Ortega's car.

Accordingly, we reverse Ortega's conviction for second degree murder and need not discuss his other arguments challenging that conviction.

### III.  DISPOSITION

Ortega's second degree murder conviction is reversed and the matter is remanded for resentencing on his assault conviction.[5]

CHOU, J.


We concur.


JACKSON, P. J.
SIMONS, J.

---

[5] Ortega's motion for calendar preference and expedited review is rendered moot by the filing of this opinion.